**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

**DAIRYLAND GREYHOUND PARK, INC.,**

   **Plaintiff,**

 **vs.**                 **Case No. 04-C-1111**

**COMMISSIONER OF INTERNAL REVENUE SERVICE,**

   **Defendant.**

---

## DECISION AND ORDER

---

  On November 12, 2004, this action was commenced by the plaintiff Dairyland Greyhound Park, Inc., ("Dairyland") against the defendant Commissioner of the Internal Revenue Service ("Commissioner"). Dairyland alleges that it was denied due process when it appealed the Internal Revenue Service's ("IRS") assessment and stated intent to file a Notice of Federal Tax Lien ("NTYL") and collect a late filing penalty. The matter was resolved on February 18, 2005; the Court granted the Commissioner's motion to dismiss because the IRS had abated the matter and no controversy remained for the Court to decide.

  All that remains in this action is Dairyland's motion for attorney's fees, as well as administrative and litigation costs pursuant to 26 U.S.C. § 7430 and Fed. R. Civ. P. 54(d).

*Applicable Law*

Under the Internal Revenue Code, 26 U.S.C. § 7430,[1] the prevailing party in any court proceeding brought by or against the United States in connection with determination, collection, or refund of any tax, interest, or penalty may be awarded a judgment for reasonable attorney's fees incurred in connection with the administrative proceeding within the IRS and before this Court. *See* 26 U.S.C. § 7430(a)(2). A party may be awarded attorney's fees if: (1) it is a prevailing party; (2) the claim is reasonable; (3) it did not unreasonably protract the proceeding; and, (4) it exhausted all administrative remedies. *See New Hope Serv., Inc. v. United States*, 285 F.3d 568, 569 (7th Cir. 2002).

Section 7430 defines "prevailing party" as any party which (1) substantially prevails with respect to the amount in controversy or substantially prevails with respect to the

---

[1]Section 7430 of Title 26 of the United States Code provides:

> In general. – In any administrative or court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title, the prevailing party may be awarded a judgment or a settlement for–
> (1) reasonable administrative costs incurred in connection with such administrative proceeding within the Internal Revenue Service, and
> (2) reasonable litigation costs incurred in connection with such court proceeding.
> (b) Limitations. –
> (1) Requirement that administrative remedies be exhausted.– A judgment for reasonable litigation costs shall not be awarded under subsection (a) in any court proceeding unless the court determines that the prevailing party has exhausted the administrative remedies available to such party within the Internal Revenue Service. Any failure to agree to an extension of the time for the assessment of any tax shall not be taken into account for purposes of determining whether the prevailing party meets the requirements of the preceding sentence.
> (2) Only costs allocable to the United States. – An award under subsection (a) shall be made only for reasonable litigation and administrative costs which are allocable to the United States and not to any other party.
> (3) Costs denied where party prevailing protracts proceedings. –
> No award for reasonable litigation and administrative costs may be made under subsection (a) with respect to any portion of the administrative or court proceeding during which the prevailing party has unreasonably protracted such proceeding.

most significant issue or set of issues, and (2) meets the time limitations and net worth requirements set out in 28 U.S.C. § 2412. 26 U.S.C. § 7430(c)(4)(A)(i)-(ii). A party shall not be treated as a "prevailing party," however, if the United States can establish that its position in the proceeding was "substantially justified." 26 U.S.C. § 7430(c)(4)(B)(i). Furthermore, there is a rebuttable presumption of no justification if the IRS did not follow "its applicable published guidance in the administrative proceeding."[2] 26 U.S.C. § 7430(c)(4)(B)(ii).

"Substantial justification" means "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations and citations omitted). In other words it means a reasonable basis both in law and fact. *Id.* It is well-settled that a party's position can be substantially justified but incorrect, as long as a reasonable person could think that the position was correct. *Id.* at 566 n.2; *United States v. Hallmark*, 200 F.3d 1076, 1079-80 (7th Cir. 2000). Thus, in order to prevail in this circuit, the United States must show that its position was grounded in: (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory propounded; and (3) a reasonable connection between the facts alleged and the legal theory propounded. *Hallmark*, 200 F.3d at 1081; *Phil Smidt & Son, Inc. v. NLRB*, 810 F.2d 638, 642 (7th Cir. 1987).

In its determination, the Court focuses on the United States's conduct both in the prelitigation and litigation context. *Hallmark*, 200 F.3d at 1081. Attorney's fees may be awarded in cases where the United States's prelitigation conduct was not substantially justified even though its litigating position may have been substantially justified. *Marcus v. Shalala*, 17 F.3d

---

[2]The statutory definition of "applicable published guidance" includes "regulations, revenue rulings, revenue procedures, information releases, notices and announcements." *See* 26 U.S.C. § 7430(c)(4)(B)(iv).

1033, 1036 (7th Cir.1994). The purpose of § 7430 is to deter abusive IRS conduct and to enable taxpayers to vindicate their rights regardless of their economic circumstances. *See Powell v. Comm'r of Internal Revenue*, 791 F.2d 385, 388 (5th Cir. 1986).

Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that "costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law." Section 2412(a)(1) of Title 28 of the United States Code, the Equal Access to Justice Act, states:

> Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

28 U.S.C. § 2412(a)(1). *See also* 28 U.S.C. § 2412(e) (second sentence.)

### *Relevant Background Facts[3]*

Dairyland, a Wisconsin corporation, operates a greyhound dog racing track located in Kenosha, Wisconsin. (Compl. ¶ 5.) Dairyland has employed three controllers. (Second ("2nd") Heidi Churchill ("Churchill") Aff. ¶ 1.) The first controller died during the winter of 1999-2000. (*Id.* at ¶ 2.) The second controller's employment was terminated in April 2002. (*Id.*) In 2002, Churchill became Dairyland's controller and, according to record in this matter, she remains employed by Dairyland in that capacity. (*Id.* at ¶¶ 1-2.)

---

[3] The background facts are based upon the parties' statements of facts to the extent they are uncontested and/or supported by the affidavits and/or declarations and exhibits thereto. The Court has also gleaned some relevant facts directly from the parties' factual submissions.

For the year 2000, Dairyland was required to file IRS W-2G (Certain Gambling Winnings)[4] forms with the IRS on magnetic media (e.g. floppy disks) by February 28, 2001. If Dairyland utilized electronic transmission, the forms were to be filed by April 2, 2001.

In late February or early March 2001, Dairyland discovered that its computer operating software was corrupted and Dairyland could not access any of the data for the over 6,000 W-2G forms it issued in 2000. (Churchill Aff. ¶ 14.) As a result, Dairyland purchased a new $30,000 operating system from Ram Info System ("Ram") for its computerized accounting system. (*Id.* at ¶ 15.) Ram began installing accounts, customizing and eliminating any problems with the system, and entering the data. (*Id.*) Ram's invoice to Dairyland for its March 2001, services, includes charges for "taxes prep." An attachment to the invoice further identifies labor relating "W-2G files to IRS the 29th and 30th." (*Id.* at ¶ 19.) Dairyland did not file its W2-G forms by April 2, 2001. A 30-day extension of the time for filing W-2G forms may be requested by filing an IRS form 8809. A second extension of not more than 30 days may be requested by submitting another form 8809. Dairyland never requested an extension of the filing deadline for its 2000 W-2G forms.

---

[4]Each time a patron wins more than $600, Dairyland must issue a W-2G form. (2nd Churchill Aff., Ex. K.) The patron is required to present a photo identification card and a social security card to cash a winning ticket. (*Id.*) The identification information is written on the W-2G form and the form is signed by the patron. (*Id.*) The W-2G forms are forwarded to the accounting department to be entered into the computer system for transmission to the IRS. (*Id.*)

On April 5, 2001, Dairyland filed its 2000 W-2G forms on magnetic media.[5] On August 26, 2002, the IRS issued a notice to Dairyland. In that notice, the IRS proposes a penalty under the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 6721, of $75,000, for "late filing, missing or incorrect TINS (taxpayer identification numbers)" plus $6,000 for reporting missing or incorrect TINS. (Dumas Decl. ¶16, Ex. B at 2 , 6.)[6] Page four of the notice itemizes the penalty amount and specifies that 6,237 W-2G returns were filed late and 105 of those returns had incorrect TINS. (Dumas Decl. ¶16, Ex. B at 6.)

In late summer or early fall 2004, the IRS assessed the $75,000 late filing penalty.[7] The IRS did not assess the proposed $6,000 penalty for Dairyland's reporting of incorrect information. On September 22, 2003, the IRS sent Dairyland a notice of intent to levy. (2nd Churchill Aff. ¶ 14, Ex. I.) The balance owing was $75,360.43, which included the $75,000 penalty plus $360.43 in interest. (*Id.*)

On October 7, 2003, Churchill, who had the primary responsibility for dealing with IRS personnel and has been involved in this matter since that time, telephoned the IRS and spoke

---

[5]Dairyland objects to this fact, relying upon the Second Affidavit of Churchill. (*See* Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Atty's Fees & Costs ("Pl.'s Reply") 4 ¶ 5 (citing 2nd Churchill Aff. ¶ 7).) Churchill avers that "Dairyland uses the same computer software for data collection and transmittal of both its Forms 1099 and of its Forms W-2G; accordingly, Dairyland **would not** have gone through the cumbersome process of creating floppy disks to mail more than 6,000 Forms W-2G when it had the capability to transmit those forms electronically, as was done with its Forms 1099 for the taxable year 2000." (2nd Churchill Aff. ¶ 25.) Churchill's statement that Dairyland **would not** have created floppy disks hedges the question of whether **Dairyland** created floppy disks. Thus, Dairyland has not refuted the factual information that Dairyland filed its W-2G forms by mail. (*See* Gukich Decl. ¶ 7.) Nor has Dairyland rebutted the IRS notice dated August 26, 2001, which states that on April 5, 2001, the IRS received 6,244 W-2G forms on "magnetic." (Dumas Decl., Ex. B at 2.)

[6]Page five of the August 22, 2002, notice is not included in the exhibit. (*See* Dumas Decl., Ex. B.)

[7]The exact date of the assessment is disputed. (*Compare,* Sykes Decl. ¶ 1 with 2nd Churchill Aff. ¶¶ 12, 24, Ex. I.) Dairyland argues that the penalty must have been assessed before September 22, 2002, because the Notice of Intent to Levy issued on that date includes interest of $360.43. (*See* Pl.'s Reply 4, ¶7.) Dairyland reasons, when the then current IRS interest rates are considered, the assessment must have been made four or five weeks prior to September 22, 2002. (*Id.*)

to Mrs. Skin ("Skin") to inquire about the basis for the penalty. (Churchill Aff. ¶ 21.) That same day, based on Skin's advice, Churchill sent a letter of inquiry to the IRS in Cincinnati, Ohio ("Cincinnati IRS office"). (*Id*. at ¶ 22.) The letter states that Churchill is "not certain what this penalty is for" and requests a "listing of how this penalty was calculated." (2nd Churchill Aff. ¶ 15, Ex. I.)

An IRS "final notice of intent to levy and notice of right to a hearing" form dated November 29, 2003, lists the $75,000 penalty balance and $1,149.00 in interest. (2nd Churchill Aff. ¶ 16, Ex. J.) This final notice informs Dairyland that the IRS will levy to collect the $75,000 late filing fee penalty and instructs Dairyland that December 29, 2003, is the last day to request a Collection Due Process ("CDP") hearing regarding the levy.

In a letter dated December 2, 2003, to the Cincinnati IRS office, Churchill requested abatement of the penalty. Churchill's letter sets forth her understanding of "reasonable cause" relating to missing/incorrect taxpayer information. (2nd Churchill Aff. ¶ 17, Ex. K.) On December 2, 2003, Churchill also spoke to an IRS employee and was instructed to call back on January 6, 2004, to receive an update on the matter.

On January 5, 2004, Churchill received a telephone call from Mr. Parton ("Parton"),[8] an IRS employee. He advised Churchill that her December 2, 2003, abatement request had been sent "upstairs for consideration" and "the issue was on hold." (2nd Churchill Aff. ¶ 18, Ex. E at 1, Ex. I at 1.)

---

[8]Parton's first name is not provided. (2nd Churchill Aff. ¶ 18, Ex. E at 1, Ex. I at 1.) A handwritten note regarding the phone call with Parton lists a phone number with an 859 area code – a Lexington, Kentucky area code. (2nd Churchill Aff. ¶ 18, Ex. I.)

On January 21, 2004, the Automated Collection Services Support Group at the Cincinnati IRS service center issued a notice of levy in the amount of $76,625.04 to Dairyland's bank. (Churchill Aff. ¶ 24.) Dairyland's bank "froze" that sum in Dairyland's account. (*Id.*)

In January 26, 2004, Dairyland's bank telephoned Churchill and advised her that the IRS had levied on Dairyland's bank account. (2nd Churchill Aff. ¶ 19.) That same day, Churchill telephoned the IRS about the levy and wrote the IRS requesting written confirmation that it was placing a 60-day hold on the levy. (*Id.*, Ex. M.) In Churchill's letter, she inquired why the penalty was being imposed. (*Id.*)

On January 27, 2004, Churchill received a notice from the Cincinnati IRS office stating that the IRS is researching the matter and will provide information about its intended course of action within 90 days. (2nd Churchill Aff. ¶ 20, Ex. N.)

At this juncture, IRS offices in several locations became involved with the Dairyland matter. A day or two later, Churchill received a letter, dated January 26, 2004, from the IRS, notifying her that it had filed a tax lien with the Kenosha County Register of Deeds and providing a copy of the Notice of Tax Lien for $75,000. (2nd Churchill Aff. ¶ 20, Ex. O.) The notice, prepared by the Chicago, Illinois IRS office ("Chicago IRS office"), states that Dairyland may request a Collection Due Process ("CDP") hearing by mailing a notice to the IRS's Bensalem, Pennsylvania office ("Bensalem IRS office") by February 27, 2004. (*Id.*)

By letter dated February 14, 2004, the Cincinnati IRS office advised Dairyland that it had released the levy of Dairyland's bank account. (2nd Churchill Aff. ¶ 20, Ex. P.)

Dairyland filed a CDP hearing request on February 23, 2004.[9]  On March 2, 2004, Dairyland received a letter from the IRS's Covington, Kentucky office ("Covington IRS office") stating that Dairyland's request for CDP hearing is being forwarded to its Milwaukee, Wisconsin Appeals Office ("Milwaukee Appeals Office").  (2nd Churchill Aff. ¶ 22, Ex. R.)  Dairyland also received a letter dated March 3, 2004, from the Cincinnati IRS office stating that its December 3, 2003, letter is being referred to an appeals office.  (*Id.*, Ex. S.)[10]  Dairyland also received a letter dated March 16, 2004, from the Cincinnati IRS office stating that Dairyland's January 26, 2004, "inquiry" is being researched.  (2nd Churchill Aff. ¶ 22, Ex. T.)

On April 2, 2004, IRS tax specialist employee Amylynn Skavla ("Skavla") of the Covington IRS office advised Churchill during a telephone conference that the penalty was imposed due to Dairyland's late filing of returns.  Skavla requested additional information from Dairyland so that she could further consider the matter.

Another IRS office became involved when the Cincinnati IRS office sent a letter to Dairyland dated April 9, 2004, stating that Dairyland's January 26, 2004, "claim" was sent to

---

[9]There is a factual dispute regarding whether one or two CDP hearing requests were filed and whether a third appeal was filed.  Relying on the Gukich Declaration, the IRS asserts that two CDP requests were filed on February 23, 2004, one challenging the notice of intent to levy, and the other challenging the notice of federal tax lien.  The IRS also maintains that a separate appeal was filed.  (*See* Gukich Decl. ¶¶ 3-6.)

Relying upon the Second Churchill Affidavit, Dairyland maintains that only one appeal was filed.  (2nd Churchill Aff. ¶ 21, Ex. Q.)  Counsel for Dairyland states, however, that "though both boxes should have been checked only the box pertaining to the levy was checked."  (Pl.'s Reply 5.)  The box that was checked on the form request for the collection due process hearing filed by Dairyland, states "notice of levy/seizure."  (*See* 2nd Churchill Aff. ¶ 21, Ex. Q.)  Determination of whether Dairyland filed one or more appeals involves credibility issues that cannot be resolved on a paper record.

Nonetheless, based on the materials before the Court – specifically Exhibit Q to the Second Churchill Affidavit – the IRS could reasonably treat Dairyland as having filed an untimely appeal from the November 29, 2003, notice of intent to levy since only that box was checked on the form.  However, such determination does not resolve how many appeals Dairyland filed.

[10]The second page of the letter identifying the specific appeals office which would handle the Dairyland matter is not included in the exhibit.  (*See* 2nd Churchill Aff. ¶ 22, Ex. S.)

–9–

the IRS Appeals office in Brookhaven, Ohio ("Brookhaven Appeals office"). (2nd Churchill Aff. ¶ 22, Ex. U.) The letter states that the IRS believed that such office could best process Dairyland's "request" and answer its questions. (*Id*.)

On April 29, 2004, Churchill sent five pages of material to Skavla via facsimile. (*Id*, Ex. V.)[11] On May 4, 2004, the Milwaukee Appeals office sent a letter to Dairyland outlining the appeals process and identifying Gwanda Dumas ("Dumas") as Dairyland's IRS contact person. (*Id*., Ex. Y.)

In a letter dated May 20, 2004, Skavla issued a decision stating that "[b]ased on the information submitted either in writing or by telephone, it appears that there is no basis on which the penalty(s) or any part thereof may be abated." (2nd Churchill Aff. ¶ 24, Ex. X.) The letter states that since Dairyland previously indicated that it did not agree with the IRS's determination, Dairyland should submit an enclosed claim Form 843 to the IRS center which processed Dairyland's form and a written statement that the claim for refund should be immediately disallowed. (*Id*.) The letter explains that the IRS will then issue a notice of disallowance and that Dairyland would have two years from the date of disallowance to file an action in the appropriate United States District Court or the United States Court of Federal Claims. (*Id*.)

Dumas held a telephone conference with Churchill on August 24, 2004, and a second telephone conference with Dairyland's power of attorney, Nick Lascari ("Lascari") on September 2, 2004. Dairyland did not dispute that the IRS had followed its procedures in assessing the penalty and issuing both the Final Notice of Intent to Levy and the Notice of

---

[11]Only one page is attached to the Second Churchill Affidavit.

Federal Tax Lien filing. The only issue Dairyland raised was its request that the penalty be abated.

Churchill and Lascari told Dumas that there was reasonable cause for Dairyland's failure to file the W-2G forms for 2000. Churchill stated that the accounting firm hired by Dairyland to prepare its taxes converted from a DOS to a Microsoft Windows operating system causing Dairyland to file the forms late. Churchill also stated that Dairyland could not recover the penalty from the accounting firm because it was no longer in business, and that it was the first time that Dairyland had filed its returns late. Churchill acknowledged that Dairyland had not requested an extension of time for filing its 2000 W-2G form.

Dumas concluded that the penalty assessment was proper because Dairyland was late in filing its 2000 W-2G forms and did not have reasonable cause for its tardiness. Dumas noted that Dairyland could have requested an extension of the filing deadline but did not.

On October 15, 2004, the Milwaukee Appeals office issued a decision letter concerning Dairyland's equivalent hearing which sustained the penalty.[12] (Timothy I. Gukich ("Gukich Decl."), Ex. A.) An attached summary explained the IRS's basis for its decision. (*Id.*)

Dairyland's representatives spoke with Gukich, the manager of the Milwaukee Appeals team, several times both before and after the Milwaukee Appeals office issued its decision. In these conversations, Churchill and Lascari told Gukich that Dairyland had attempted to file the W-2G forms on time electronically but there was a computer error. Dairyland's

---

[12]Because the IRS determined that Dairyland's CDP hearing request was untimely, it conducted an "equivalent hearing," which is "a hearing equivalent to a due process hearing except that there is no right to dispute a decision by the Appeals Office in court under IRC 6320 and/or 6330." (Gukich Decl., Ex. A at 1.)

-11-
Case 2:04-cv-01111-RTR    Filed 05/30/06    Page 11 of 17    Document 20

attempts to file electronically are purportedly evidenced by a computer printout, which is simply a blank piece of paper stating that the disk contained no data.[13]

Dairyland representatives indicated that Dairyland had not prepared an IRS Form 4804, which is a prerequisite to the electronic filing of forms. The absence of that form caused Gukich to further doubt that Dairyland had attempted to file on time.

Dairyland also argued that Gukich should abate the penalty because the offense was Dairyland's first offense. Gukich explained that there are certain penalties for which the IRS routinely grants abatements if the taxpayer has not previously incurred a penalty. However, Gukich stated that the late filing penalty under I.R.C. § 6721 is not such a penalty and, moreover, this was not Dairyland's first offense.

Dairyland filed its federal action on November 12, 2004. On approximately November 15, 2004, Lascari telephoned Linda Pilgreen ("Pilgreen"), IRS Acting Director of Area 6 Appeals in St Paul, Minnesota. (Pilgreen Decl. ¶ 1.) Pilgreen oversees the appeals offices including the offices in Milwaukee and Ogden, Utah ("Ogden Appeals office"). (*Id.* ¶ 2.) Lascari requested reconsideration of the IRS's decision to sustain the late filing penalty. One more IRS office became involved, when Pilgreen instructed the Ogden Appeals office to reconsider the penalty. At the time, Pilgreen was not aware of the instant lawsuit.

Internal Revenue Service Appeals Officer Jerry D. Sykes ("Sykes") reviewed the matter and did not find that Dairyland had reasonable cause for the late filing of its year 2000 W-

---

[13] There is a dispute regarding the source of the paper. Gukich avers that Dairyland produced the paper. (Gukich Decl. ¶¶ 12-13.) Churchill avers that the document was not generated by Dairyland and "upon information and belief they were produced by IRS and transmitted to Dairyland's former controller during the first quarter of 2001." (2nd Churchill Decl. ¶ 29.)

2G forms. However, Sykes decided to abate the penalty because he determined that Dairyland had taken steps to prevent a reoccurrence of its late filing. In so concluding, Sykes relied upon the steady decrease in Dairyland's penalties from $250,000 to $75,000 in 2000, to only $450 in 2001. By letter dated November 29, 2004, Sykes informed Dairyland that he had decided to abate the penalty.

*Analysis*

Dairyland asserts attorney's fees should be awarded because the government waited 2½ years to assess the $75,000 late filing penalty, levied on Dairyland's bank account even though Dairyland made prior contact and filed a notice of inquiry, protracted the case over five years with multiple assignments of Dairyland's applications and appeals, and then, in October 2004, through its Milwaukee Appeals office informed the taxpayer that given the nature of the penalty it could not be abated. (Pl.'s Br. 5.) Maintaining that the efficacy of the litigation and the untruthfulness of the October 2004, letter[14] is established by the Commissioner's November 29, 2004, letter stating that the penalty will be abated, Dairyland asserts that it is entitled to the costs and fees incurred in these proceedings.[15] (*Id.*)

---

[14]Dairyland is referring to the October 15, 2005, letter from the Milwaukee Appeals office sustaining the penalty.

[15]Dairyland seeks to recover $9,295.00 in accounting fees for services provided by certified public accountant Nicolas S. Lascari ("Lascari") with Virchow, Krause & Company, LLP on this controversy. (Lascari Aff. ¶¶ 1, 5.) The claimed accounting fees are for 37.85 hours of accounting work at Lascari's standard hourly rate of $247 per hour (minus write-offs and rounding of charges). (*Id.* ¶ 4.) Dairyland also seeks to recover $5,560.00 in attorneys fees at the rate of $300 per hour for 19.2 hours of work (minus write-offs and roundings of charges) and $340.00 in disbursements. (Matthews Aff. ¶¶ 4-5.)

The Commissioner contends that the Court lacks jurisdiction to consider Dairyland's motion. (Def.'s Br. 1.) Alternatively, the Commissioner states that the motion should be denied because his position in both the administrative process and this litigation was substantially justified and because Dairyland protracted the administrative proceedings. (*Id*. 1-2.)

In maintaining that the Court lacks jurisdiction, the Commissioner relies upon *Wise v. Comm'r of Internal Revenue*, 168 F. Supp. 2d 649, 651-52 (S.D. Tex. 2001)[16] and *Glanz v. United States*, No. 97-606T, 1997 WL 718474, at *3 (S.D. Tex. Sept. 17, 1997).[17] Both cases are distinguishable because they involved disputes between taxpayers and the Internal Revenue Service that were resolved administratively **and** prior to the commencement of a lawsuit in federal court.

In this case, the administrative settlement occurred after Dairyland commenced this action. On January 18, 2005, the Commissioner appeared, seeking a 30-day extension of time to file his answer. The Court granted that extension. Thereafter, on February 17, 2005, the Commissioner filed a motion to dismiss the action because the matter had been abated. Thus, this

---

[16]*Wise*, 168 F. Supp. 2d at 651, involved a taxpayer who challenged a December 1996 IRS assessment. She prevailed at the administrative level in October 1997. *Id*. Thereafter, the taxpayer unsuccessfully attempted, at the administrative level, to recover administrative costs and attorney's fees for disputing the assessment. *Id*. The taxpayer then instituted her federal lawsuit seeking administrative costs and fees. *Id*. In response to the Commissioner's motion to dismiss, the taxpayer added a claim for wrongful collection. *Id*. The Commissioner supplemented his motion to dismiss. *Id*. The Court granted the motion, finding that the taxpayer had not stated a claim for wrongful collection and that, even if she had, any such claim was time-barred. *Id*. Because there was no substantive claim before it, the Court dismissed the taxpayer's claim for administrative and litigation costs for lack of jurisdiction. *Id*. at 654.

[17]*Glanz*, 1997 WL 718474, involved a taxpayer who succeeded in administratively contesting a tax levy. The issue was resolved administratively when the plaintiffs received a check dated April 25, 1997, for levied bank funds plus interest. On September 2, 1997, the plaintiffs commenced an action before the United States Court of Claims to recover their legal fees from the United States. The Court held that it had jurisdiction over cases involving the refund of taxes but that it lacked jurisdiction over the plaintiffs' complaint because they never filed a case before it seeking a refund. *Id*. at *3.

case challenging the merits of the Commissioner's action was commenced, prior to the administrative settlement, and the Court has jurisdiction over Dairyland's motion.

However, the Court concludes that the Commissioner has meet his burden of demonstrating that his administrative and litigating position was substantially justified. Dairyland's W-2G forms were late. Although Dairyland could have requested an extension of time to file its W-2G forms, it did not. Even if Dairyland had requested an extension after it realized that it was unable to file its forms electronically (more than 30-days after the deadline for filing paper forms), Dairyland would have demonstrated its attempt to seek an extension from the IRS. Furthermore, given the uncontested absence of the 4804 form which the IRS requires be submitted by electronic filers to submit, the IRS was justified in rejecting Dairyland's computer difficulties as an excuse for the late filing of the W-2G forms. The IRS's conclusion that Dairyland had not established reasonable cause[18] for its late filing had a reasonable basis in law and fact. Sykes's decision to abate the penalty was a discretionary determination on the part of the IRS.

There is nothing to suggest that the Commissioner's litigating position was inappropriate or involved questionable tactics. The Commissioner sought an extension of time to answer. Then, the Commissioner alerted the Court to the settlement and promptly moved to

---

[18]Section 6724 of Title 26 of the United States Code sets forth the waiver rules that apply to the penalties for failure to comply with certain IRS reporting requirements. It provides that "[n]o penalty shall be imposed under this part with respect to any failure if it is shown that such failure is due to reasonable cause and not to willful neglect." 26 U.S.C. § 6724(a). The burden of showing reasonable cause is on the party seeking the waiver. *Lefcourt v. United States*, 125 F.3d 79, 83-84 (2d Cir. 1997) (citing *McMahan v. Commissioner*, 114 F.3d 366, 368 (2d Cir.1997).) "'[R]easonable cause and not willful neglect' must refer not simply to whether the taxpayer acted voluntarily in the sense of acting consciously, but also to whether the filer's reason for so acting was objectively reasonable under the circumstances." *Lefcourt*, 125 F.3d at 94. *See also* 26 C.F.R. § 301.6724-1.

dismiss. Based on the foregoing, the government's position was substantially justified.

The Commissioner maintains that Dairyland protracted proceedings. Dairyland asserts that the Commissioner is responsible for protracting the proceedings. The Court is not persuaded by either party's assignment of blame. The IRS's notices and letters regarding the reason for the penalty are clearer than claimed by Dairyland. Dairyland's persistence in requesting an explanation for the penalty, which had already been set forth clearly, may have contributed to the confusion and multiplicity of IRS efforts. Dairyland relies on Parton's January 5, 2004, statement that the issue was "on hold," as meaning that there would be no levy. The meaning of "on hold" is open to interpretation and, at any rate, the record before this Court is provides no indication of what Parton meant.

The multiple letters generated by the IRS in the late winter and the spring of 2004, reflect the multiple avenues through which Dairyland fought the $75,000 penalty. While coordinated responses would have been helpful, the IRS cannot be faulted for responding to the multiple inquiries spawned by Dairyland. While certainly desirable, the law does not require an agency to have streamlined or centralized processes. The circumstances presented by the IRS's multiple responses to Dairyland's concerns do not translate into a claim that the Commissioner's actions protracted the proceedings or lacked substantial justification.

Dairyland's multiple inquiries may have created some confusion and conflicting responses. But, Dairyland's efforts reflect persistence in attempting to contest a significant monetary penalty. Based on the record, the Court does not find that Dairyland protracted the proceedings.

-16-
Case 2:04-cv-01111-RTR    Filed 05/30/06    Page 16 of 17    Document 20

Since the Commissioner's position was substantially justified, Dairyland's motion for attorney's fees, administrative and litigation costs is denied.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Dairyland's motion for attorney's fees, administrative and litigation costs pursuant to 26 U.S.C. § 7430 and Fed. R. Civ. P. 54(d) is **DENIED**; and,

This action is dismissed.

Dated at Milwaukee, Wisconsin this 30th day of May, 2006.

                **BY THE COURT**

                **s/ Rudolph T. Randa**
                **Hon. Rudolph T. Randa**
                **Chief Judge**